**E-FILED**
Wednesday, 27 July, 2016  09:44:16 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| LORI S. MORRISON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15-cv-3124 |
| | ) | |
| CAROLYN COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant, | ) | |

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Lori S. Morrison appeals from the denial of her application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act.  42 U.S.C. §§ 416(i) and 423.  This appeal is brought pursuant to 42 U.S.C. § 405(g).  This matter is before this Court for a Report and Recommendation on Morrison's Motion for Summary Judgment (d/e 11), and Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 14).  For the reasons set forth below, this Court recommends that the Plaintiff Morrison's Motion should be ALLOWED, Defendant Commissioner's Motion should be DENIED, and the

decision of the Commissioner for the reasons set forth below, should be REVERSED and REMANDED.

## STATEMENT OF FACTS

Morrison was born on May 27, 1963.  She completed the twelfth grade.  She previously worked as a coal miner and a construction worker. She alleged that her disability began on April 19, 2011.  She filed her application for Disability Benefits on June 13, 2012.  Morrison suffers from cervical degenerative disc disease and carpal tunnel syndrome.  She has undergone three cervical spine surgeries and bilateral carpal tunnel release surgeries.  Certified Transcript of Proceedings before the Social Security Administration, (d/e 7) (R.), 10, 12, 38, 137, 139, 172.

On May 12, 2008, Morrison injured her neck in a work-related accident.  On October 21, 2008, Morrison underwent surgery on her cervical spine, consisting of a cervical discectomy and fusion at C5-6 and C6-7.  R. 261, 268.

On October 16, 2009, Dr. Joseph Williams, M.D., performed a C4-5 anterior cervical discectomy and fusion on Morrison.  On May 12, 2010, Morrison saw Dr. Williams.  Morrison reported that she was back at full duty at work since March 15, 2010.  She reported that she took tramadol every eight hours for pain.  She reported some numbness in the left upper

extremity and some axial neck pain.  On examination, Morrison had normal strength, normal sensation, and normal gait.  Dr. Williams stated that x-rays showed good alignment and healing.  Dr. Williams assessed that the discectomy and fusion were healed.  Dr. Williams released Morrison to work without restrictions.  R. 246.

On June 1, 2010, Morrison saw orthopedic surgeon Dr. Thomas Lee, M.D.  Morrison complained of pain in her neck and right shoulder, and pain and numbness in her hands and arms.  R. 263.  Dr. Lee recommended a CT myelogram to rule out an incomplete fusion at C4-5 or a stress fracture at C6-7.  R. 261.

On August 25, 2010, Morrison saw Dr. Lee again.  Morrison reported numbness over both hands and improvement in her neck pain.  Dr. Lee noted that the CT myelogram showed some right-sided cervical root attenuation at C4 and C6.  Dr. Lee assessed C6-7 incomplete fusion. R. 260.  Dr. Lee opined that Morrison appeared to have an incomplete fusion at C5-6 which was symptomatic, and a transfer lesion at C3-4 that was symptomatic.  R. 261.  Dr. Lee recommended cervical plate removal, anterior cervical discectomy and fusion (ACDF) and hardware removal at C4-5, and a total disc replacement at C3-4.  R. 260.

On April 11, 2011, Morrison saw orthopedic surgeon Dr. Donald DeGrange, M.D.  Morrison reported persistent neck pain.  Dr. DeGrange noted that Morrison had two prior spinal fusions at C4-5, C5-6, and C6-7. Dr. DeGrange found that x-rays and CT scans showed pseudoarthrosis at C6-7.  Dr. DeGrange recommended a revision of her pseudoarthrosis with decompression at C6-7, hardware removal from C4-C7, and corpectomy at C6 with fusion from C5-C7.  R. 282.  Dr. DeGrange performed the surgery on April 19, 2011.  R. 285-90.  On April 29, 2011, x-rays showed multiple postoperative changes and mild bony osteopenia.  R. 293.

On June 27, 2011, x-rays of Morrison's cervical spine showed proper alignment of the spine, and no change in the placement of the screws and plate inserted during surgery.  The radiologist found no change from the April 29, 2011, x-rays.  R. 295.

On September 7, 2011, x-rays of Morrison's cervical spine showed a stable anterior fusion with no changes since the June 27, 2011 x-rays. R. 296.

On October 20, 2011, x-rays of Morrison's cervical spine showed a fusion at C4-5, C5-6, and C6-7 without fracture.  R. 297.

On November 17, 2011, Morrison underwent an EMG/nerve conduction study. The study showed moderate neuropathy across the right

and left carpal tunnels.  The study showed no evidence of cervical radiculopathy or brachial plexopathy.  The ulnar nerve studies were unremarkable.  R. 631.

On January 4, 2012, Morrison underwent a bone scan.  The scan showed increased uptake in the minimal or cervical spine that did not strongly suggest nonunion or pseudoarthosis; "very very mild uptake" in the lower thoracic spine, indicating a prior compression fracture that was nearly healed; and, "Mild uptake at C-3 spinous process.  This may relate to prior trauma with continued healing."  R. 299.

On January 19, 2012, Morrison saw orthopedic surgeon Dr. Mark Greatting, M.D. for pain, numbness and tingling in her upper extremities. Dr. Greatting noted that Morrison had EMG/nerve conduction studies performed on November 17, 2011.  The studies showed evidence of bilateral carpal tunnel syndrome.  On examination, Dr. Greatting observed positive signs for bilateral moderate carpal tunnel syndrome.  Dr. Greatting diagnoses bilateral carpal tunnel syndrome.  Dr. Greatting noted good motion in Morrison's shoulders, elbows, forearms, wrists, and hands.  Dr. Greatting told Morrison, however, that the pain radiating down into her shoulders, arms, and elbows was not all related to carpal tunnel syndrome. Some of those symptoms were related to her cervical spine problems post-

surgery.  Dr. Greatting administered corticosteroid injections and prescribed splints to be worn at night.  R. 520.

On February 6, 2012, Morrison saw health care professional Allison Neff in the offices of Dr. Eric Bleyer, M.D.[1]  Morrison complained of recurring neck pain.  Morrison reported that her symptoms improved after her surgery, but came back after she started to engage in volunteer work in the fall of 2011.  Morrison reported neck, shoulder, and arm pain, increasing with activity; and insomnia related to the pain.  R. 335-36. Morrison reported that she saw Dr. Greatting for bilateral carpal tunnel syndrome.  Morrison reported that Dr. Greatting had administered an injection and prescribed splints that she wore at night.  Morrison reported that her hands were better, but symptoms persisted.  R. 336.

On March 1, 2012, Morrison saw Dr. Greatting.  Morrison reported that the injections helped, but her symptoms slowly returned although not as bad as before.  The splints also helped at night.  Dr. Greatting recommended bilateral carpal tunnel release surgery.  Dr. Greatting told Morrison that the surgery would not eliminate all of the pain, numbness, and tingling in her shoulders and arms.  Dr. Greatting told her that some of

---

[1] The record does not state Neff's title or credentials.  Based on the records, Neff appears to be a nurse practitioner or physician's assistant.

those symptoms were related to her cervical spine problems post-surgery.

Morrison agreed to undergo the carpal tunnel release surgery.  R. 517.

On March 5, 2012, Morrison saw neurological surgeon Dr. Margaret

MacGregor, M.D.  Morrison reported that Dr. DeGrange opined that she

reached her maximum medical improvement (MMI).  Morrison also

reported that "the work comp doctor" opined that she could return to work.

Morrison came to Dr. MacGregor "for another opinion of her options."

Morrison reported that her employer's worker's compensation administrator

required her to perform volunteer community service five hours a day, five

days a week.  She reported that her pain became worse after she started

the volunteer work.  She reported that her pain started at the base of the

skull and progressed into a headache.  R. 514.  Morrison reported difficulty

swallowing, joint pain, limitation in movement, numbness, tingling, burning,

and difficulty sleeping.  Dr. MacGregor ordered cervical x-rays, physical

therapy, and a muscle relaxant Robaxin.  R. 516.

On March 5, 2012, x-rays of Morrison's cervical spine showed fusion

and adequate alignment of C4-7, and also minimal subluxation at C2-3 and

C3-4 levels shown on flexion view.  R. 553.

On March 6, 2012, Morrison underwent right carpal tunnel release

surgery.  R. 627.

On April 3, 2012, Morrison underwent left carpal tunnel release surgery.  R. 619.

On April 25, 2012, Morrison underwent a CT scan of her cervical spine.  The scan showed osseous fusion at C4-5 and C5-6; plate and osseous fusion at C6-7; and no stenosis at any level.  R. 346.

On May 30, 2012, Morrison saw Dr. Greatting for a follow up visit after the carpal tunnel surgery.  Morrison reported that her numbness was markedly improved.  Most of her nocturnal symptoms were resolved. Morrison still had some numbness and tingling in both hands.  Dr. Greatting stated that Morrison had good results from the carpal tunnel surgery.  Dr. Greatting opined that Morrison had reached maximum medical improvement of her carpal tunnel syndrome.  He released her from care. R. 502-03.

On July 2, 2012, Morrison saw Dr. MacGregor.  Morrison reported that she was still having neck pain, headaches, and pain in both arms. Morrison reported that she could not sit for more than an hour.  Morrison reported that activities in which she held her arms out in front of her, such as typing on a keyboard, were difficult.  Morrison reported that recommended exercises and lying down helped.  On examination, Dr.

MacGregor found limited range of motion in her cervical spine, normal gait,

and unchanged strength.  Dr. MacGregor made the following note:

> Agree with her seeking unemployment/disability.  Even going to
> school will be difficult.  Also think that her being able to do
> something on her own schedule would help her.

> Follow up is planned.

> I would not recommend and do not foresee her returning to
> work in any capacity involving mining or heavy labor.
> Continuous keyboarding is also not recommended.

R. 501.

On July 24, 2012, Morrison completed a Function Report—Adult

form.  R. 198-205.  Morrison stated that due to her work injury and three

surgeries, "I have been limited to minimal physical ability to perform normal

job duties required for full time employment."  R. 198.  Morrison stated that

her daily activities depended on her level of pain.  On bad days she only

showered and ate.  On good days, she searched for jobs online, did a little

housework, a load of laundry, and "other normal activities."  R. 199.

Morrison stated that she cleaned her pet's cage weekly.  Morrison stated

that she could not sleep very well or very long.  Morrison stated that lifting

her arms above shoulder level or tilting her head caused pain.  As a result,

dressing and caring for her personal hygiene "can cause enough pain that I

can't do anything else for a few hour (sic) until I can get the pain back under control."  R. 199.

Morrison stated that she spent five to ten minutes to prepare simple meals daily.  Morrison reported that she cleaned house twenty to thirty minutes a day; and did one to two loads of laundry every four to five days. Morrison stated that she could weed flowers for about thirty minutes.  She said she needed help with other yardwork and household repairs.  R. 200.

Morrison stated that she went out one to three times a week.  She drove a car.  Morrison stated that she went shopping one to two times a week for groceries, household needs, and personal needs.  R. 201. Morrison stated that she visited with her grandchildren weekly.  She also regularly visited her parents.  R. 202.

Morrison stated that she could lift twenty-five pounds; she could walk for fifteen to twenty minutes before needing a ten minute rest.  She stated that she could not repeatedly bend or twist her neck and could not engage in prolonged work about shoulder level.  Morrison stated that she could pay attention as much as needed and follow instructions unless her pain got bad or if she was not getting enough sleep.  Morrison stated that she got along well with authority figures, she handled stress fairly well, and she handled changes in routine well. R. 203-04.  Morrison stated that her

medications affected her memory, made her tired, and caused weight gain. R. 205.

On August 13, 2012, state agency physician Dr. Young-Ja Kim, M.D., prepared a physical residual functional capacity assessment.  Dr. Kim opined that Morrison could lift twenty pounds occasionally and ten pounds frequently; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and never climb ladders, ropes, or scaffolds.  Dr. Kim opined that Morrison was limited in her ability to reach overhead and to handle and finger.  R. 75-76.

On September 13, 2012, Morrison saw Dr. MacGregor.  Morrison reported that she was starting school.  She reported that she was having neck, shoulder, and arm pain.  Morrison reported that the school was "good about accommodating her for comfort."  Dr. MacGregor noted that Morrison was taking twelve semester hours.  Dr. MacGregor characterized Morrison's course schedule as "quite demanding."   On examination, Dr. MacGregor found decreased range of motion, strength unchanged, and normal gait.  Dr. MacGregor also noted, "Balance:  sits comfortably with weight evenly distributed."   Dr. MacGregor concluded:

> I do not feel that the previously presented opportunity of
> answering phones and keyboarding for an eight hour day is

suitable for this patient.  I feel that it is in her best interest from a medical standpoint if she has a position where she has the option of changing positions as needed, and if she does keyboard, that she has the ability to do this on her own time frame.

R. 590.

On or about October 15, 2012, a Social Security Administration representative met with Morrison and completed a Disability Report—Appeal form.  R. 209-14.  Morrison reported that after August 20, 2012, her pain worsened in her neck, shoulders, upper back, arms, and hands. Morrison reported that she was dropping things.  She reported that "the more I do, the worse I feel."  Morrison reported that her headaches and muscle tension worsened.  Morrison also stated that she was sleeping less due to the pain.  R. 209.  Morrison reported that she could sit, stand, or lie down for an hour, and then needed to change positions.

On December 20, 2012, Morrison saw Dr. MacGregor.  Morrison reported that her symptoms had worsened.  Morrison stated that she slept three to four hours a night due to pain.  Morrison reported that the pain radiated from her neck down her right arm.  Morrison reported developing pain in her left hip that radiated across her lower back.  On examination, Morrison's strength was unchanged, her range of motion was decreased, her gait was normal, and she sat comfortably with weight evenly

distributed.  Morrison was taking gabapentin for nerve pain and a muscle

relaxant methocarbomal (generic for Robaxin).  Dr. MacGregor prescribed

an additional muscle relaxant flexeril.  R. 602.

On January 1, 2013, state agency physician Dr. Vidya Madala, M.D.,

prepared a physical residual capacity assessment.  Dr. Madala opined that

Morrison could lift twenty pounds occasionally and ten pounds frequently;

stand and/or walk for six hours in an eight-hour workday; and sit for six

hours in an eight-hour workday.  Dr. Madala opined that Morrison had no

postural limitations.  Dr. Madala opined that Morrison was limited to

frequent overhead reaching, handling, and fingering.  R. 86-87.

On February 11, 2013, Morrison saw Nurse Practitioner Elvia

Washington in the offices of Dr. MacGregor.  Morrison reported neck pain

and bilateral numbness and tingling in her hands.  Morrison reported that

her hands felt cold.  On examination, Morrison had good range of motion

with all extremities.  Her upper push-off strength was good, but her hand

squeezes were "a little weak bilaterally, but still intact."  R. 605.

On March 25, 2013, Morrison saw Nurse Practitioner Washington.

Morrison reported that she was about the same.  Morrison reported that the

increased dosage of gabapentin helped.  Morrison reported increased pain

down the left side of her arm.  Morrison reported moderate discomfort and

limited range of motion.  Washington noted that Dr. MacGregor was not planning to do any surgery unless absolutely necessary because Morrison would lose all range of motion.  On examination, Morrison had a "moderate range of motion."  Morrison's flexion and hyperextension of her neck was "very diminished at this time."  Morrison sat with her shoulders "slightly pushed up on her for support."  Morrison's strength was diminished in her upper extremities.  Morrison's gait was normal.  Morrison sat in a chair with her weight evenly distributed.  R. 609.  Washington prescribed massage and continued dosage of medications.  R. 610.

On April 29, 2013, Morrison saw Nurse Practitioner Washington. Morrison reported that she had pain in her neck, shoulders, and arms, with numbness and tingling down her arms into her hands, with the right worse than the left.  Morrison reported that she did not sleep well at night. Washington advised Morrison to wait as long as possible before consenting to another cervical spine surgery.  Washington recommended increasing the gabapentin dosage to her "neuropathy-type pain."  On examination, Morrison sat in the chair with her weight evenly balanced.  Morrison did some shifting and twisting of her neck during the examination.  Strength was 4/5 bilaterally, with the left slightly weaker than the right.  Washington noted that Morrison's lower extremities were "moving well with no signs of

any problem."  Morrison's gait was normal.  Washington increased the

gabapentin dosage and added a trial of Toradol.  Washington also

recommended soft tissue massage.  R. 603-04.

On June 27, 2013, Morrison saw nurse practitioner Washington.

Morrison reported one incident occurred in which she could not move her

right hand fingers for about forty-five seconds.  On examination, Morrison

had some difficulty with flexion, extension, and lateral rotation of her neck.

Morrison had some significant weakness in her upper extremities rated at

3/5 to 4/5 on the right and 4/5 on the left in the biceps and triceps.  Hand

grip was slightly diminished.  R. 611-12.  X-rays taken on June 27, 2013,

showed a stable postoperative fusion of the cervical spine.  R. 613.

On August 29, 2013, Morrison saw nurse practitioner Washington.

Morrison reported that she was taking it easy before school started and

things were going "pretty good."  Morrison reported that she started school

again, and her pain started again.  Morrison reported pain in her neck,

shoulders, arms, wrists, and hands.  Morrison reported headaches also.

Morrison reported that she "drops a lot of things."  Morrison reported that

her legs and feet swelled "really bad several times."  Morrison reported

some slight balance problems when arising from a sitting position.

Morrison reported no falling.  On examination, Morrison had limited range

of motion.  Her gait was normal.  No foot drop was identified.  R. 607.

Washington recommended "breaking down" the gabapentin dosage to

address the swelling.  Washington also recommended keeping her legs

elevated and drinking plenty of fluids.  R. 608.

On October 31, 2013, Morrison saw Dr. MacGregor.  Morrison

reported increased pain in her neck, shoulders and arms; and numbness in

both hands, with the left worse than the right.  Morrison reported that she

was having a hard time with her classes and course work because of pain

in her neck.  Morrison reported daily headaches. Dr. MacGregor gave

Morrison samples of a topical analgesic Voltaren gel.  R. 617.

<u>THE EVIDENTIARY HEARING</u>

On December 9, 2013, the Administrative Law Judge (ALJ) held an

evidentiary hearing in Peoria, Illinois.  R. 32- 68.  Morrison appeared with

her attorney by videoconference from Springfield, Illinois.  Vocational

expert Bob Hammond appeared by telephone.  R. 34.

Morrison testified first.  Morrison lived in a one-story house with a

friend.  Morrison indicated that she previously worked in a coal mine and

worked construction on residential rental properties owned by her family.

Morrison said that she did all types of types of construction work.  R. 40-41.

Morrison testified that currently she was in a two-year college program.  She started in August 2012 and would complete the program in the spring of 2014.  R. 39-40.  Morrison stated that she was in a state unemployment program in which she was allowed to draw unemployment while she went to school.  She said that she paid for the schooling. R. 40-42.  Morrison related that she hoped to find a job where she could work from home on her own schedule.  R. 54.

Morrison indicated that she was studying business management. She testified that school was "very difficult."  She testified:

> I have a lot of – I have their special needs help.  All my books are on my computer so that I can have my books read to me.  I have note takers.  I can record classes.  I have to sit close to the door because I need to get out and get up and move because it's hard for me to stay in one position for long.  R. 39.

Morrison explained she will get up and go outside the classroom and stand against the wall to take the pressure off her neck.  R. 54-55.

Morrison testified that she drove back and forth from school.  She said that she had other people type most of her papers.  She testified she could type for ten to fifteen minutes at a time.  R. 56-57.

Morrison indicated that she scheduled her classes so that she had only one class a day.  She also had one night class.  She said that she went home after each class to "take care of the pain."  R. 54.  She testified

that she went to bed and listened to her books on her computer or the recordings of her class while lying down.  R. 58.  Morrison testified that she had not missed class due to her pain.  R. 57.

Morrison indicated that she has not needed extra time to take her exams because the exams have been short.  R. 57-58

Morrison stated that her doctor put her on "heavy restrictions" after her third neck surgery.  She felt much better.  She said that her employer wanted her to do some community service.  She started volunteering at a library.  She related that after three to four days, her pain and symptoms came back.  R. 44.  She testified that she could not tilt her head down for long periods and could not hold her hands and arms in a constant position. R. 45.

Morrison said that her pain caused her primary problems.  She stated that the pain "stems from my neck, from, you know, about here in my neck and the upper part of my neck and it wraps up and round my head." Morrison testified that she had continuous headaches.  Morrison testified that the pain radiated to her shoulders and down her arms to her hands. Morrison indicated that she had severe muscle spasms.  R. 42-43. Morrison testified that the pain was like a muscle cramp that never goes away.  Morrison also had pain like a burning sensation.  R. 48.  Morrison

said that she felt a burning pain while she was testifying "like everything is on fire."  R. 48.

Morrison explained that her pain increased with activity, "[T]he more I do, the worse the pain is and the less I do, the less the pain is. . . ."  R. 43. Morrison testified that "everything I do with my arms and my hands, creates more pain in my neck that just continues to radiate, you know, down to my arms and shoulders and back."  R. 48.  Morrison said that moisture and cold weather also aggravated her condition.  R. 45.  Morrison indicated that the pain worsened when she returned to school after a break.  R. 60.

Morrison testified that her ability to work declined during the day,

> As the day progresses, you know, like I might first thing be able to do something for, you know. Maybe 30, 45 minutes and then I have to stop, and I go get into that reclining position for about, you know, 15 minutes, and as the day progresses, that time period that I can do anything shrinks, and yeah, I have a headache all the time and pain just wears me out sometimes, a lot of times.

R. 49.

Morrison said that the gabapentin helped for a while.  Morrison indicated that ice packs on her neck also helped with the pain.  Morrison related that sitting in a slightly reclined position also helped.  R. 43, 46. Morrison said that changing positions helped with the pain.  R. 48.

Morrison wore a neck brace in the car if she was going to ride for more than an hour. R. 46.

Morrison said that her former employer's worker's compensation would not approve any type of treatment at all.  She testified that her former employer would not authorize additional injections, massage therapy, or even pain medications.  She indicated that she paid for her medications herself.  R. 46-47.

Morrison stated that carpal tunnel surgery alleviated the pain in her wrists, index fingers, and thumbs.  Morrison testified that the pain and numbness in the rest of the hand remained.  Morrison said that she still experienced pain, numbness, and tingling radiating from her neck down into her hands.  R. 47-48.

Morrison testified that she was under a twenty-five pound weight restriction. R. 56.  She said that she could lift twenty-five pounds maybe one time, but not repeatedly.  R. 59.  She stated that picking up a gallon of milk was painful.  She could not raise her arms above shoulder level or reach out in front of her for any period of time.  R. 49-50.  She said that she could "mess around" on a computer for fifteen minutes.  R. 60.

Morrison stated that she could not sleep for more than an hour at a
time.  She testified she had to change positions to take the pressure off her
neck.  She also testified her arms went numb while she slept.
R. 51.  Morrison testified that she took "cat naps" during the day.  R. 60.

Morrison said that she did not do work around the house.  She
testified that the people with whom she lived did the housework.  R. 56.
Morrison indicated she went grocery shopping on days when she was not
in so much pain.  She said she shopped for ten to fifteen minutes at a time.
R. 60.

Vocational expert Hammond then testified.  The ALJ asked
Hammond:

> Mr. Hammond, I'd like you to consider an individual who's
> limited to performing the exertional requirements of light work.
> This individual can never climb ladders, ropes, or scaffolds.
> This individual can climb ramps and or stairs, balance, stoop,
> kneel, crouch, and or crawl no more than occasionally.  I'd like
> you to assume that this individual can reach overhead no more
> than occasionally.   I'd like you to assume that this individual
> can handle, finger, and reach in any other direction besides
> overhead no more than frequently.  I presume that individual
> could not perform any of the claimant's past work?  Is that
> correct?

R. 61-62.

Hammond testified that the person could not perform Morrison's prior
work.  Hammond said that the person could perform other jobs such as an

usher ticket taker, with 1,000 such jobs in Illinois and 50,000 nationally;

parking lot attendant, with 1,100 such jobs in Illinois and 45,000 nationally;

and assembler II, with 2,500 in Illinois and 108,000  nationally. Hammond

indicated that these three jobs were representative of the jobs the person

could perform.  R. 62.

Hammond testified that if the person had to alternate between sitting

and standing once an hour, then the person could perform the parking lot

attendant job.  The other two jobs would be eliminated.  R. 63-64.

Hammond said the parking lot attendant job would be eliminated if the

person had to avoid concentrated exposure to temperature extremes.

Hammond related that all light exertional jobs would be eliminated if these

two restrictions were added to the hypothetical question.

Hammond testified two sedentary jobs could be performed with the

limitations identified by the ALJ's hypothetical questions, including

alternating between sitting and standing and avoiding temperature

extremes.  Hammond said that such a person could perform the job of

pharmaceutical sealer, with 2,000 such jobs in Illinois and 90,000

nationally; and circuit board screener, with 2,000 such jobs in Illinois and

60,000 nationally.  Hammond could not identify any other sedentary jobs

that fit the hypothetical limitations.  R. 64-65.

Hammond clarified that the jobs he identified required frequent reaching overhead.  Hammond noted that all jobs would be eliminated if the person was limited to occasional overhead reaching.  R. 65.

On examination by Morrison's attorney, Hammond said that all jobs would be eliminated if the person was limited to a total less than five-and-one-half hours a day for reaching overhead, handling, and fingering.  R. 66. Hammond testified that all jobs would be eliminated if the person could only reach, handle, or finger for ten minutes at a time without taking a break.  R. 66-67.   The ALJ concluded the hearing at the end of Hammond's examination.

## THE DECISION OF THE ALJ

The ALJ issued his decision on February 21, 2014.  R. 10-23. The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of her age, education and work experience.  20 C.F.R. §§

404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found Morrison met her burden at Steps 1 and 2.  She had not engaged in substantial gainful activity since April 19, 2011, and she suffered from the severe impairments of cervical degenerative disc disease and a history of carpal tunnel syndrome.  R. 12.  The ALJ found that Morrison's impairments or combination of impairments did not meet or equal a Listing.  R. 13-14.

At Step 4, the ALJ found that Morrison had the RFC to perform light work except she could never climb ladders, ropes or scaffolds; occasionally climb ramps and/or stairs; occasionally balance stoop, kneel, crouch, and/or crawl; and frequently reach overhead, handle, and finger bilaterally. R. 14.  The ALJ based this finding on Morrison's testimony that she was placed on a twenty-five pound lifting restriction; the x-rays and other imaging studies conducted after her third neck surgery that showed a stable fusion with no stenosis or other significant problems; the November 2011 EMG/nerve conduction study that showed no evidence of cervical radiculopathy or brachial plexopathy; Dr. Greatting's notes and Morrison's testimony that indicated that the carpal tunnel surgery was successful; the examination notes by Dr. MacGregor and Nurse Practitioner Washington that showed Morrison had a normal gait, good balance when seated, and normal to slightly diminished strength; Dr. Greatting's January 2012 note

that Morrison had good range of motion in her upper extremities; the opinions of Drs. Kim and Madala regarding Morrison's RFC; Morrison's ability to drive to and from school multiple times a day on some days; the fact that Morrison never missed class due to her pain; and the fact that Morrison completed tests in her coursework without any additional time. R. 15-21.

In making the RFC finding, the ALJ found that Morrison's testimony about the severity of her limitations caused by her pain was not credible. The ALJ stated that the x-rays and other objective imaging studies, as well as the EMG/nerve conduction studies, did not show a problem that would cause the degree of pain alleged by Morrison.  The ALJ also stated that her claims of the limiting effects of her pain were inconsistent with Dr. Greatting's examinations that found normal range of motion in Morrison's upper extremities; Dr. MacGregor and Nurse Practitioner Washington's examinations that found good balance when seated and normal to slightly diminished hand strength.  The ALJ stated that the slightly diminished strength supported the limiting of Morrison to the reduced range of light work set forth in the RFC, but did not support Morrison's testimony.  The ALJ stated that Morrison's claims that she had difficulty sitting in one position, moving her head, and holding her arms out in front of her for an

extended period of time were inconsistent with driving to and from school regularly and more than once a day some days.  The ALJ stated that Morrison's claims of debilitating pain were also inconsistent with never missing a class due to pain and completing tests without any accommodation.  The ALJ stated that Dr. MacGregor's recommendation to delay any further neck surgery, and the fact that Morrison had not been prescribed narcotic pain killers also supported the conclusion that Morrison's pain was not as severely limiting as Morrison claimed.  R. 17-20.

The ALJ also assigned little weight to Dr. MacGregor's opinions that Morrison would need to change positions as needed at work, and would need to perform any keyboarding on her own time frame.  The ALJ stated that the x-rays and objective imaging studies, and the EMG/nerve conduction studies did not support these opinions.  The ALJ also stated that the medical examinations that found normal gait, normal range of motion, good balance when seated, and normal or slightly diminished strength did not support these opinions.  The ALJ also noted that Dr. MacGregor did not cite any clinical evidence to support her opinions. R. 19-20.

In assessing the credibility of Morrison's subjective complaints and the facts that are set forth in 240 C.F.R. 40141529(c) in Social Security

Ruling 96-7p, the ALJ indicated that the factors did not weigh in favor of claimant's subjective assertions.  The ALJ suggested that Morrison's ability to attend classes on a regular basis and to complete tests without the aid of alternative accommodations suggests she retains a greater degree of functional ability than she alleges.  He stated that the claimant testified she had a class for an hour at a time and then goes home to attend her pain, and then returns for an evening class as well.  The ALJ commented that Morrison's ability to attend and transport herself to scheduled classes without excessive absences undermines Morrison's collective assertions.  R. 18.  The ALJ also indicated that Morrison alleged she sometimes had to stand up during class and admitted she had not missed a class due to her symptoms.  He additionally indicated that Morrison testified she had not needed to use alternative testing resources and indicated that she was capable of driving and her testimony regarding her class schedule "suggests" that she drives herself to and from school multiple times on some days.  R. 19.

Additionally, the ALJ noted that the fact that the Plaintiff had never been prescribed narcotic pain medication undermined her subjective allegations of extreme functional limitation made at her hearing.  R. 19.

The ALJ found at Step 4 that Morrison could not perform her prior work given her RFC.  R. 21.

The ALJ found at Step 5 that Morrison could perform a significant number of jobs that exist in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404 Subpart P Appendix 2, and the opinions of Vocational Expert Hammond that a person of Morrison's age with her education, experience, and RFC could perform the usher/ticket taker, parking lot attendant, and assembler II jobs. The ALJ concluded that Morrison was not disabled.

Morrison appealed the ALJ's decision.  On February 27, 2015, the Appeals Council denied Morrison's request for review.  The ALJ's decision then became the final decision of the Defendant Commissioner.  R. 1. Morrison then filed this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment.  Delgado v. Bowen, 782

F.2d 79, 82 (7th Cir. 1986).  The ALJ must articulate at least minimally his analysis of all relevant evidence.  <u>Herron v. Shalala</u>, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  <u>Clifford v. Apfel</u>, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ must articulate his analysis by building an accurate and logical bridge from the evidence to his conclusion so that the Court may afford the claimant meaningful review of the ALJ's ultimate findings.  <u>Steele v. Barnhart</u>, 290 F.3d 936, 941 (7th Cir. 2002).  It is not enough that the record contains evidence to support the ALJ's decision, if the ALJ does not rationally articulate the grounds for that decision or if the decision is not sufficiently articulated so as to prevent meaningful review, the Court must remand.  <u>Id</u>.

The ALJ in this case followed the guidance in SSR 96-7p that was in effect at the time of his decision, but is now superseded.  As noted above, the ALJ determined that the claimant's statements regarding the intensity, persistence, and limiting effects of her symptoms were not entirely credible. SSR 16-3p provides that the persistence and limiting effects of individual symptoms must be determined from the entire case record including the objective medical evidence, an individual's statements about the intensity,

persistence and limiting effects of symptoms, statements and other information provided by medical sources and other persons, and any other relevant evidence in the individual's case record.

In making his credibility decision to determine Morrison's RFC, the ALJ emphasized and analyzed the retention of functional ability by considering Morrison's ability to pursue educational opportunities in the period of alleged disability.  R. 15, 18, 19.  The ALJ found that Morrison's ability to attend classes on a regular basis suggests that she retains a greater degree of functional ability than she claims.  R. 19.  This analysis appears to be a central part of the ALJ's decision.

The Plaintiff testified that she had one class a day, except for one night class.  She specifically indicated that she just had an hour per day for classes and tried to keep them spread apart because "it's really hard".  The Plaintiff said: "I need to go home and take care of pain once I've done that." R. 54.  The ALJ, however, indicates that Plaintiff's testimony regarding her class schedule "suggests" that she drives herself to and from school multiple times on some days.  R. 19.  The ALJ does not explain this conclusion.  The ALJ's interpretation does not appear consistent with the testimony of the claimant.   The ALJ does not clearly articulate how he determined that the Plaintiff's having an hour a day for classes and going

home to take care of pain after she has gone to class "suggests" the conclusion that she drives herself to and from school multiple times on some days.  R. 19.

The ALJ noted that while the Plaintiff indicated her examinations could last up to two hours, she has not needed to use alternative testing resources.  R. 19.  The Plaintiff testified she had not had to use alternative testing resources because most of her tests have really been "pretty short". R. 58-59.   The ALJ did not indicate how the Plaintiff's ability to "complete tests without need for alternative accommodation" shows a greater degree of functional ability than the Plaintiff has alleged.   R. 18.  Morrison's testimony only indicates that the Plaintiff has not needed to use the alternative accommodations because the exams are short.

The ALJ also concluded that the claimant "has class for an hour at a time then goes home to attend her pain, then returns for an evening class as well".  R. 18.   Again, this inference appears to be unsupported by the record (R. 54) and the ALJ gives no explanation of what portion of the record gives rise to that inference.

The ALJ fails to explain how the claimant's attendance of a one-hour class during a day with special needs help such as having note takers and having seating close to the door because the Plaintiff needs to get out and

get up and move because it's hard for her to stay in one position (R.13),

equates to the ability to maintain full time employment.  The Seventh Circuit

has repeatedly cautioned that a person's ability to perform daily activities,

especially if that can be done only with significant limitations, does not

necessarily translate into an ability to work full time.  Roddy v. Astrue, 705

F.3d 631, 639 (7th Cir. 2013).  SSR 16-3p indicates that an individual's

statements about the intensity, persistence, and limiting effects of

symptoms cannot be disregarded solely because the objective medical

evidence does not substantiate the degree of impairment related symptoms

alleged by the individual.[2]

The ALJ fails to provide an accurate and logical bridge between the

evidence concerning the claimant's school attendance for a one hour class

---

[2] Long after the briefs in this case were filed the Social Security Administration, on March 16, 2016,
issued Social Security Rule 16-3p, 2016 WL 1119029 (SSR 13-3p).  SSR 13-3p clarified the analysis of
credibility.  SSR 13-3p indicated that credibility should not be analyzed by assessing an individual's
overall character or truthfulness in the manner typically used in adversarial court litigation. SSR 13-3p
indicates the term "credibility" shall not be used even though it's superseded predecessor SSR 96-7p,
1996 WL 374186, required the adjudicator to make a finding of credibility of the individual's statements.
The ruling indicated that the focus must be on whether the evidence establishes a medically determinable
impairment by analyzing the entire case record including the objective medical evidence; the individual's
statements about the intensity, persistence, and limiting effects of symptoms; and the statements and
other information provided by medical sources and other persons and other relevant evidence in the
record.  In this case, the ALJ did not make his credibility decision based upon an assessment of
Morrison's overall character or truthfulness, but considered the evidence in the record in making the
credibility determination.  At least five other courts in this Circuit have concluded that SSR 16-3p applies
retroactively.  McCammond v. Colvin, 2016 WL 3595736, at *2-4 (N.D. Ill. July 5, 2016); Farrar v. Colvin,
2016 WL 3538827, at *5 (N.D. Ill. June 29, 2016); Lockwood v. Colvin, 2016 WL 2622325, at *3 n.1 (N.D.
Ill. May 9, 2016); Hapberg v. Colvin, 2016 WL 1660493, at *6 (N.D. Ill. April 27, 2016); Pietruszynski v.
Colvin, 2016 WL 1535158, at *6 n.6 (N.D. Ill. April 14, 2016).  However, since the ALJ in this case
essentially followed the clarified rule established under SSR 16-3p in his consideration of the evidence
related to credibility, it is unnecessary to remand this matter simply to order the ALJ to conform his
decision to the requirements of SSR 16-3p.

per day, with special accommodations, and the conclusion that the Plaintiff is capable of full time employment.

The same is true with the ALJ's reliance on the fact that the claimant has never been prescribed narcotic pain medications.  R. 19.  The ALJ noted that Dr. MacGregor had increased the claimant's medication by increasing her gabapentin prescription more than once and added a muscle relaxant to her medication.  No explanation is provided why these increases in medication dosage were not sufficient without the prescription of narcotics.  The determination of whether narcotics should be prescribed for pain is a medical determination.  The ALJ made no logical bridge between the failure of claimant's doctors to prescribe narcotics and the ALJ's conclusion that the Plaintiff has the ability to work on a fulltime basis.

The ALJ must articulate at least minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).  The failure to do so in this case as outlined above requires a remand.  On remand, the ALJ can address his reasons for concluding that Plaintiff's school attendance and the lack of the prescription of narcotic drugs make the Plaintiff capable of fulltime employment.

The Court will not comment on other issues raised on appeal because the reevaluation of the evidence of Plaintiff's ability to be employed on a fulltime basis could result in a revision of the findings in the ALJ's decision.

THEREFORE, THIS COURT RECOMMENDS that Plaintiff Lori Morrison's Motion for Summary Judgment (d/e 11) should be ALLOWED, Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 14) should be DENIED, and the decision of the Commissioner should be REVERSED and REMANDED pursuant to sentence four of 42 U.S.C. § 405(g).

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

ENTER:   July 27, 2016

_s/ Tom Schanzle-Haskins_
UNITED STATES MAGISTRATE JUDGE